Frank P. SCHNEIDER et al., Plaintiffs-
Appellees and Cross-Appellants,

v.

The ELECTRIC AUTO–LITE COMPANY,
a Corporation, Defendant-Appellant
and Cross-Appellee.

Nos. 71–1287, 71–1288.

United States Court of Appeals,
Sixth Circuit.

March 8, 1972.

Eugene T. D'Ablemont, New York City, for Electric Auto-Lite Co.; Shumaker, Loop & Kendrick, John W. Hackett, Jr., Toledo, Ohio; Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, on brief.

M. L. Okun, Toledo, Ohio, for Frank P. Schneider, and others; Gordon A. Holder, Toledo, Ohio, on brief.

Before WEICK, McCREE and BROOKS *, Circuit Judges.

WEICK, Circuit Judge.

The suit in the District Court was a class action brought by employees of Auto-Lite under Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185(a), to recover damages against Auto-Lite arising out of the permanent shutdown of its plant in Toledo, Ohio, in August, 1962.

The case was tried only on the issues relating to liability. The determination of any damages which plaintiffs may be entitled to recover was reserved for a later hearing. The case involved claims for lost wages, vacation pay, pension rights and insurance benefits under a collective bargaining agreement between Auto-Lite and the employees' bargaining representative, Mechanics Education Society of America, Local 7 [MESA].

The District Court denied the claims of employees for lost wages, and unjust enrichment due to Auto-Lite's control of the pension fund, and other claims, but it did hold that the employees were entitled to recover pro rata vacation pay based on 1962 earnings, the value of conversion rights on group term life insurance as of August 31, 1962, and the present value of pension rights as of March 1, 1963.

Auto-Lite manufactured electric automotive equipment, in Toledo, Ohio. Prior to 1962 it had several plants located there, and thousands of workers were employed in the area. More than 90% of its employees were members of Local 12, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW). The skilled employees were members of MESA.

Chrysler Corporation was the largest customer of Auto-Lite's Toledo plants. Over 70% of the Toledo plants' production was devoted to the manufacture of automotive product lines for Chrysler. The source of Auto-Lite's labor diffi-culties began in 1957, when Chrysler notified Auto-Lite that it had decided to manufacture its own electrical parts because this would be more economical. A phase-out agreement was negotiated between the two companies and by September, 1960, Auto-Lite's production for Chrysler was terminated.

In 1959 when MESA's skilled Divisions Agreement (SDA) was about to terminate, a new collective bargaining agreement was entered into. It was to run for three years until March 1962, and would automatically renew for an additional year unless either party gave written notice of termination. During this negotiation, discussions took place concerning the combination of Auto-Lite's Model Shop and tool room. The consensus resulting from such discussions was not embodied in the contract proper, but was included in a letter signed by R. M. Thornton, an Auto-Lite executive in charge of labor relations. The District Court found that this letter was a part of the contract.

The Thornton letter confirmed an agreement arrived at during the negotiations, namely, that departments numbers 39 and 40 were to be combined, and that if the experimental section of department number 40 was moved from plant number 2 to another plant, then the oldest seniority employees in each needed classification would be given an opportunity to bid for the new experimental department.

In 1960 Auto-Lite began transferring product lines to a newly acquired plant in Decatur, Alabama. In August, 1962, Auto-Lite's remaining Toledo operations at the plant were closed down, and work was transferred to the Decatur and to the Bay City, Michigan, plants. During the phase-out, Auto-Lite set up a new machine shop in its Toledo Hamilton Street plant. Work which was formerly done in the closed Toledo plant's tool room was transferred to the Michigan and Alabama plants. Auto-Lite offered to transfer terminated employees

---

* The Honorable Henry L. Brooks died on December 30, 1971.

(MESA) to the Bay City plant in needed classifications with full credit for service for purposes of fringe benefits, but not layoff. UAW was the bargaining agent at the Bay City plant.

The last work at the Toledo plant to be done by MESA members was performed on August 3, 1962. On that day, or the day before, some MESA members picketed the Toledo Champlin Street plant, first with "Unfair" signs, and later with "Strike" signs. Some members carried similar signs to the Bay City plant.

Auto-Lite claimed that these activities constituted a strike, in violation of the agreement with the union, and on August 27, 1962, it notified plaintiffs that it was canceling group term life insurance coverage effective August 31, and on August 28th it notified plaintiffs that it was terminating all agreements between MESA and Auto-Lite, including all rights and benefits thereunder. The SDA contained a no-strike clause and a conciliation clause.[1]

On August 29, 1962, MESA filed an unfair labor practices charge with NLRB, and on November 20, 1962, the Labor Board's Regional Director held that the no-strike provision of the contract was violated and that the company therefore was privileged to cancel the contract. On November 9, 1962, MESA filed another charge with NLRB alleging that the company at its Hamilton Street building was performing, with non-union employees, work that MESA employees had previously done in department 40 under the SDA. The Regional Director refused to issue a complaint, finding that the Hamilton Street operation was an entirely new depart-

ment. This ruling was affirmed by the General Counsel's office.

The District Court found that MESA's picketing was of short duration and caused only slight inconvenience. The Toledo plant had shut down. The Court also determined that the strike was not in violation of the SDA, but rather was an empty and meaningless protest. The picketing was the direct result of the shutdown. The Court also found that Auto-Lite earlier had committed a material breach of the contract because of its transfer of the model shop work to the Hamilton Street location without giving model shop employees the right to transfer, as agreed in the Thornton letter.

I

CLASS ACTION

■ Auto-Lite contends that the present suit cannot be brought as a class action on behalf of either hourly-rate employees or salaried employees who are neither parties nor third-party beneficiaries to the SDA.

Certainly the liberal interpretation given by the Supreme Court to Section 301, relative to suits by individual employees, argues for allowing such an action. Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962).

Such reasoning certainly would not preclude a class action on behalf of hourly-rate employees. Although plaintiffs sued on the SDA, they sued also for the "same typical breaches of contract," which claims related to the salaried employees' contracts. Consequently, and because we feel that the requisites of Rule 23(a) Fed.R.Civ.P. are met, MESA salaried employees are properly within the class[2].

---

1. Conciliation grievance procedure was not pursued by the plaintiffs in respect to the claims in this suit.

2. Rule 23(a) Prerequisites to a Class Action.
 One or more members of a class may sue or be sued as representative parties on

behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or de-

The following factors compel our view that the class action is proper. Approximately three hundred individuals are in the class. Both the SDA and the salaried employees' contracts were automatically renewed for the same period. In a letter dated August 28, 1962, Auto-Lite treated these contracts as a unit by canceling all of its collective bargaining agreements with MESA. With respect to the issues of liability, the contracts are substantially the same. Group term life insurance was under one company-wide program. The rights to vacation pay were also subject to the same qualifying date. One pension plan covered all Auto-Lite employees. In addition, the same events and actions by Auto-Lite triggered the termination of rights held by both the hourly-rate and the salaried employees. The differences in the contracts do not affect the substance of the fringe benefit claims which the plaintiffs assert, and do not seem to justify separate suits.

Because of similarities in the claims presented, the District Court was correct in liberally interpreting Rule 23 in order to avoid burdensome litigation and to give efficient disposition to this action. Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968). In fact, since this action has already been in litigation in the District Court for more than four years, a dismissal of the class action would be injudicious and wasteful.

## II

## GRIEVANCE PROCEDURE

■ The District Court held that the grievance procedure provided in Article IV of SDA did not apply in this case, which involved broad issues, but rather was concerned with individual problems between foreman and employee[3].

The introduction to Article IV of the SDA, "Grievance Procedure" states the applicability of the clause:

"In the case of a dispute between the foreman and any employee, the steps in the Grievance Procedure are as follows: . . . ."

The controversy in the present case did not involve disputes between foremen and employees.

Auto-Lite contends that the "Grievance Procedure" must have been exhausted before a suit could be brought. We agree with the District Court that the agreement's grievance procedure is inapplicable to the type of dispute involved in this suit, and therefore that such procedures need not have been exhausted as a prerequisite to this suit[4].

## III

## VACATION PAY

■ The District Court granted the employees pro rata vacation pay for the time worked in 1962. Auto-Lite appeals this ruling, and plaintiffs cross-appeal, contending that vacation pay should have been awarded for the full year of 1962.

---

fenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

3. In Bsharah v. Eltra Corp., 394 F.2d 502 (6th Cir. 1968), the same District Court that heard the present case dismissed an action brought by a former employee of Auto-Lite who sought transfer rights to the defendant's Bay City, Michigan plant. Plaintiff was a member of the UAW, not MESA, and was subject to a contract with a grievance procedure more stringent than the one involved here. This Court affirmed the District Court's dismissal of

the suit for failure to exhaust the contractual grievance procedure.

4. The District Court stated at 273a–274a : "Well, again, I do not think that this matter came within the scope of the grievance procedures provided by the contract . . . . This doesn't seem to me to cover grievances of the nature and extent of these . . . . But I don't think that the matters that are involved in this dispute were contemplated or covered by the grievance procedure provided, and therefore there is no burden on anybody to do anything with the grievance procedures."

The wage supplement to SDA provides vacation pay according to a percentage formula. In relevant part SDA provides:

"Vacation pay of eligible employees shall be based on total straight time earnings for the previous 12 months' period January 1 through December 31. Any employee who is in the active employ of the Company, or laid off, or retired, or on leave of absence on December 31 shall be entitled to vacation pay, calculated as described here, but the actual payment will not be made until just prior to the time designated by the Company as the vacation period."

The action of the District Court was correct for a number of reasons. The contract was entered into on February 27, 1959, and on March 1, 1962 it was automatically renewed for another year because neither party gave notice of termination. The contract language explicitly covers the situation in which an employee is laid off, retired, or on leave of absence, but there is no mention of a plant shutdown. We must look to see how other such clauses have been interpreted by the courts.

Auto-Lite urges that Briggs v. Electric Auto-Lite Co., 37 Wis.2d 275, 155 N.W.2d 32 (1967), governs. *Briggs*, involving the same contract provision, held the qualifying date of December 31 as a *sine qua non* to vacation pay. However, where the weight of federal law implies a different result, as in the present case, we cannot find *Briggs* controlling. Wisconsin law is inapplicable.

Absent contrary indication, vacation pay is viewed as compensation for work. Here, in fact, vacation pay is based on previous earnings, fortifying the conclusion that such was the intent of this contract, and this principle is one long established.

"A vacation with pay is in effect additional wages. It involves a reasonable arrangement to secure the well-being of employees and the continuance of harmonious relations between employer and employee." (In Re Wil-Low Cafeterias, 111 F.2d 429, 432 (2d Cir. 1940).

". . . [T]he arbitrator accurately stated, 'Arbitrators and courts have long recognized that vacation pay is a fringe benefit paid in lieu of a direct wage increase and in that sense constitutes deferred wages.'" (Baldwin-Montrose Chem. Co. v. International Union, 383 F.2d 796, 798 (6th Cir. 1967)).

In Smith v. Kingsport Press, 366 F.2d 416 (6th Cir. 1966), the contract provided that in order to receive vacation pay an employee must be on the payroll on the fourth Friday in March, but employees went on strike on March 11. In awarding vacation pay, the Court stated:

"We are further satisfied that absent any language to the contrary we must conclude that the vacation pay for which the collective bargaining agreement provided was consideration for past service rendered and was therefore due and payable to the employees in question in this case." (Id. at 420).

This Court agrees with Professor Archibald Cox's view that this contract clause ought to be interpreted in the same way that settled industrial practice interpreted others, and that such an interpretation would provide pro rata pay. Professor Cox was the arbitrator in Telescope Folding Furniture Co., 49 L.A. 837 (1967), where the contract provided:

"Employees to be eligible for . . . vacation with pay shall have worked one hundred forty (140) working days prior to August 1st of the vacation year."

The company asserted that this clause required that the claimant be a company-employee on August 1st of the vacation year. In holding for the employees, Professor Cox stated:

"Nevertheless, I must conclude that the particular contract before me was intended to have the meaning given

to similar vacation clauses by settled industrial practice, unless there is some evidence of a contrary intent. In the long run only confusion and misunderstanding would result from attaching different legal consequences to substantially the same words." (*Id.* at 839).

And finally, even absent the above reasons, this Court would have to conclude that pro rata vacation pay was due the employees because it was the company's action in closing the plant that prevented employees from working until the December 31st date. Such a conclusion is mandated by this Court's recent decision in Local Union 186 United Packinghouse Food and Allied Workers v. Armour & Co., 446 F.2d 610 (6th Cir. 1971, cert. applied for). The Court, after finding that a January 1 qualifying date was not a *sine qua non* for vacation pay eligibility (in a slightly differently worded contract), went on to say:

"Even assuming the company's argument that the anniversary date was an inexorable condition of eligibility for vacation, we find critical the fact that it was the action of the company itself which made impossible the satisfaction of this condition." (*Id.* at 614).

"Thus it appears that the company's unilateral action in closing down the plant, which is effectively a refusal to accept the proffer of continued performance on the part of the employees, removes the obligation of working until their anniversary dates, even if it is viewed as a material part of the contract." (*Id.* at 615).

*Accord,* Mays Landing Water Power Co., 12 L.A. 860 (1949); L. Hyman Co., 13 L.A. 800 (1949).

Consequently, this reason alone would be sufficient to allow recovery by employees of vacation pay for work done, especially where, as here, vacation pay was based on earnings. There is no authority, however, which would allow recovery for vacation pay for any period after an employee ceased work.

## IV
## LOST EARNINGS

On cross-appeal plaintiffs contend that they are entitled to lost earnings for the "experimental" or model shop's employees who were not given opportunity to move with their work when the work was removed to other locations. This claim is based upon provisions of the so-called Thornton letter, which the District Court found to be "part of the contract between the parties." There is ample evidence to sustain this finding. This letter confirmed a verbal understanding that the model shop and tool room would be combined, and stated:

"In the event that the Experimental Section of Department 40 (formerly Department 39) is moved from Plant #2 to another plant, the oldest seniority employees in each needed classification will be given the opportunity to bid for the new Experimental Department."

The record establishes that the model shop work was transferred to the Bay City and Decatur plants, and the District Court found that some of the model shop work was transferred to the Experimental Machine Shop in the Hamilton Street Office Building, in Toledo.

Plaintiffs are not entitled to lost earnings for work moved to the Bay City and Decatur plants, however, for we agree with the District Court's finding that the Thornton letter applied only to moves within the Toledo area. Thornton had no authority to grant bid rights outside the Toledo area. One MESA member testified on deposition in 1967 that he considered the letter to mean only moves to other Toledo plants. Moreover, the District Court was best suited to weigh the testimony and conduct of both parties in construing the contract. Prior actions by the parties indicated that both sides construed the letter to apply to Toledo plants only.

This case is similar to Oddie v. Ross Gear & Tool Co., 305 F.2d 143 (6th Cir. 1962), wherein this Court rejected the

plaintiff's last-minute contract interpretations which were contrary to their prior conduct and action.

We now consider the bid rights to jobs at the Hamilton Street plant, which was within the Toledo area. The District Court found:

"The evidence . . . clearly establishes that in setting up the new shop in Hamilton Street, and in failing to permit employees in the old shop to bid for the jobs there, the defendant was deliberately and calculatedly in breach of its contract with the plaintiff."

Although the evidence does not clearly establish this, in view of the complicated, confusing, and often conflicting testimony, we are of the opinion that the District Court's finding is not "clearly erroneous." Rule 52(a) Fed.R.Civ.P.

The District Court held, however, that the former employees whose bid rights would have entitled them to jobs at the Hamilton Street plant, were not entitled to damages, because it considered that "the nature and extent of plaintiffs' damages would mainly be speculative." We do not agree. There should be no great difficulty in determining which, if any, of the former employees would have been entitled, through their bid rights, to employment at the Hamilton Street plant. Once that is determined, those plaintiffs are entitled to recover any lost earnings which they can prove. These plaintiffs, of course, were under a duty to mitigate damages at the time of the work transfer.

### V

### PENSION RIGHTS

Auto-Lite maintained a company-wide non-contributory pension fund for all its employees in its plants throughout the United States and Canada. In order to qualify for a pension, an employee must have attained the age of 40 years, and must have had ten years of credited service. Such qualification entitled an employee to a vested right to a deferred pension beginning at age 65. The Dis-

trict Court granted relief to those employees who were denied by Auto-Lite the forms and means to file for pension rights, and to those employees who would have become eligible for pension rights had their employment rights continued until March 1, 1963, the date of termination of the SDA. The Court awarded the present value as of March 1, 1963, of such pension rights. Auto-Lite contests this liability, and plaintiffs now seek pension benefits for all MESA employees who by the shutdown were prevented from completing eligibility requirements, even if they would not have qualified as of March 1, 1963.

SDA was not an employment contract, but rather it was a collective bargaining agreement. Thus, the employment relationship, for fringe benefit purposes, should not have been extended beyond the date of actual termination of work. This Court, in a similar situation, held in Fraser v. Magic Chief-Food Giant Markets, Inc., 324 F.2d 853 (6th Cir. 1963):

"Rights of employees under a collective bargaining agreement presuppose an employer-employee relationship. A collective bargaining agreement, in ordinary usage and terminology, does not create an employer-employee relationship nor does it guarantee the continuance of one. Employees' rights under such a contract do not survive a discontinuance of business and a termination of operations." (*Id.* at 856).

See also Knoll v. Phoenix Steel Corp., 325 F.Supp. 666 (E.D.Pa.1971), where the Court rejected the employees' argument that despite the actual termination of their employment, they remained employees for purposes of qualifying under terms of the pension plan.

Consequently, employees who had not achieved the requisite age and service as of August 1962, are not entitled to pension benefits. Nevertheless, those employees who the District Court found "did undertake to file for pension rights

but were denied by the defendant the forms and means to do so" are entitled to recover, for it cannot be said that the District Court's findings that the company prevented such filings, are "clearly erroneous." Rule 52(a) Fed.R.Civ.P. These employees are entitled to recover from Auto-Lite the present value of their pension rights as of the date of termination of their employment. This present value will, of course, properly reflect the probability of survival to the qualifying age.

## VI

## LIFE INSURANCE

■ The District Court awarded the value of conversion rights of the group insurance policy as of August 31, 1962, to each employee who was entitled to convert to an individual policy. It determined that the defendant destroyed the conversion rights, apparently because it found wrongful Auto-Lite's termination of the collective bargaining agreement, including insurance coverage.[5]

Nevertheless, we cannot agree that such cancellation entitled plaintiffs to the relief awarded, because even without Auto-Lite's cancellation of the agreements, the insurance coverage would have terminated, because the employees' employment ended. Section 10 of the relevant agreement provides:

"At the end of the month in which the employment of an insured Employee is terminated, other than by death, all coverage provided for him under the program will terminate."

Consequently, since all MESA employees were terminated by August, 1962, all insurance coverage would have ended by August 31, 1962, whether or not Auto-Lite attempted to cancel coverage because of what it considered an "illegal strike."

The insurance policy carried a conversion privilege, granting to each employee the right to convert to straight life insurance within 31 days after termination of coverage. This privilege was stated in the certificate issued to each covered employee.[6] No employee exercised this right.

If Auto-Lite led MESA employees to believe that the conversion privilege was destroyed or canceled, then only would there be any basis for the District Court's award. (Conversion rights cannot now be granted, for Travelers Insurance Company is no longer a defendant in this suit.)

Examination of the communications between Auto-Lite and MESA employees indicates that conversion rights were not mentioned; that employees were told only that group insurance coverage was no longer available; and that no rights existed under the collective bargaining agreements.[7]

---

5. Termination of the MESA agreements was expressed in the following letter:

December 18, 1962

"Dear Former Employee:

"Inasmuch as we terminated our contracts with the Mechanics Educational Society on August 28, 1962, and completely and finally discontinued all operations covered by said contracts on August 1, 1962, and have no intention of resuming said operations, persons formerly represented by the MESA in our plant no longer have any rights under said contracts or as employees of The Electric Autolite Company.

Very truly yours,
/s/ C. E. Daly, Director
Personnel Administration"

6. The Certificate stated:

"Any Employee of the Employer covered under this group policy shall, in

case of the termination of employment for any reason whatsoever, be entitled to have issued to him by the company without further evidence of insurability, and upon application made to the company within Thirty-one days after the termination of the insurance . . . a policy of life insurance . . . . ."

7. The communications are as follows:

August 28, 1962

"Mr. Henry G. Dreyer
Chairman, Tool and Die and Machinists Unit
Local 7, M.E.S.A.
2923 Stickney Avenue
Toledo 8, Ohio
Dear Mr. Dreyer:

Because of your persistent violation of our collective bargaining agreements with M.E.S.A., Local 7, by engaging in an illegal strike and picketing of our

Thus, it cannot be said that any MESA employees were misled by the company; rather, by reading the certificate of insurance one would realize that group coverage would terminate at the end of August, 1962, and that conversion rights could be exercised for thirty-one days thereafter. Plaintiffs, therefore, are not entitled to the value of conversion rights.

## VII

## PAID-UP INSURANCE

Plaintiffs maintain that they are entitled to the value of term life insurance policies of from $500 to $1,000, because such policies are part of the employees' pension rights. They argue that since the District Court awarded the present value of pension rights as of March 1, 1963, each employee who is eligible for pension rights is entitled to the present value of a life insurance policy of his particular death benefit value. However, this Court has determined that the District Court's award of pension rights as of March 1, 1963, was improper. It follows, then, that the value of a policy which was part of such pension rights, could not be recovered.

 In any event, such paid-up insurance was not a benefit available when employment was terminated, but rather, it was available only upon retirement under the Pension Plan. The Agreement provided:

"If an Employee is eligible for Insurance under this Program, and his employment terminates because of retirement under the Pension Plan, . . his life insurance under this Program will be continued without cost . . . "

Consequently, employees who did not "retire", but whose employment was terminated because of the plant's permanent shutdown, are not entitled to paid-up insurance; neither would employees be entitled to such benefits if they retired after August 31, 1962, for they would no longer have insurance coverage at the time of their retirement. No employee, then, is entitled to recover the value of any "paid-up" insurance.

## VIII

## ATTORNEY'S FEES

 Finally, plaintiffs seek an allowance of attorneys' fees, relying on the recent holding in United Steelworkers of America v. Butler Mfg. Co., 439 F.2d 1110 (8th Cir. 1971). It is admitted, however, that this issue was never raised at any stage of the proceedings below.

This Court requires that an issue be raised in the District Court before it will be considered on appeal. Wiper v. Great Lakes Eng'r Works, 340 F.2d 727 (6th Cir. 1965); Myers v. Alvey-Ferguson Co., 326 F.2d 590 (6th Cir. 1964).

The judgment of the District Court is modified and the case is remanded to the District Court for further proceedings not inconsistent with this opinion.

Toledo and Bay City plants, we are hereby terminating all of our collective bargaining agreements with M.E.S.A., Local 7, effective immediately. This letter will serve as official notice to you of such termination.

Very truly yours,
F. M. Wistert"

---

August 27, 1962
"Dear Employee or former Employee in M.E.S.A. Bargaining Units
This is to advise you that group insurance coverage under the Company's Group Insurance Program will no longer be available to former employees represented by M.E.S.A. because the M.E.S.A. Local 7 is continuing to engage in an illegal strike against the Company and is continuing to picket the Company's properties in Toledo, Ohio and Bay City, Michigan. Therefore, the Company will not accept premium payments by any former employees represented by M.E.S.A. for the month of September or any month thereafter.

Very truly yours,
/s/ F. M. Wistert"