Joseph POLICY; William Driscoll; John Chufo; et al., Plaintiffs-Appellants,

v.

The POWELL PRESSED STEEL COMPANY, Defendant-Appellee.

No. 84–3301.

United States Court of Appeals, Sixth Circuit.

Argued June 11, 1985.

Decided Aug. 20, 1985.

Rehearing and Rehearing En Banc Denied Oct. 15, 1985.

Mark A. Rock, Schwarzwald, Robiner, Wolf & Rock, Cleveland, Ohio, William T. Payne (Policy), Lead Counsel, Daniel McIntyre, argued, Pittsburgh, Pa., for plaintiffs-appellants.

Christopher J. Newman, argued, Henderson, Covington, Stein, Donchess & Messenger, Youngstown, Ohio, for defendant-appellee.

Before MERRITT and CONTIE, Circuit Judges, and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

This is a class action, brought pursuant to section 502(a) of ERISA, 29 U.S.C. § 1132(a), and section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, in which plaintiffs, three retired employees of defendant Powell Pressed Steel Company (the Company), seek to compel the Company to resume providing health insurance benefits for certain groups of Company retirees.

Plaintiffs contend that, under the collective bargaining agreement between the Company and the United Steelworkers of America, the Company is obligated to provide health insurance benefits to pensioners and their spouses "during the life of the pensioner." Plaintiffs contend the Company has ceased providing these benefits. Defendant Powell Pressed Steel Co. admits that it has terminated retirees' health insurance benefits, but contends that its obligation to provide health insurance coverage to retirees ended with the August 31, 1982, expiration of the collective bargaining agreement.

In the district court, plaintiffs moved for a preliminary injunction reinstating their benefits. The district court held a hearing and denied plaintiffs' motion on the ground that plaintiffs were not likely to succeed on the merits. The parties agreed to forego a trial; consequently, the district court decided the merits of the case based on the testimony elicited at the preliminary injunction hearing plus supplementary briefs and a deposition. The trial court found that the Company's duty to provide health insur-

ance benefits to retirees had ended with the expiration of the collective bargaining agreement. Therefore, the court entered judgment for the defendant Company without addressing the class certification issue. Because, as a matter of law, we interpret the collective bargaining agreement to unambiguously grant lifetime health insurance benefits to certain retirees, we reverse.

## I. Background

The record establishes that beginning in 1964 the collective bargaining agreement between the Company and the union provided that the Company would pay 50% of the cost of its pensioners' benefits supplemental to Medicare. Payment of the remaining 50% was the responsibility of the individual pensioner. In 1966, a new collective bargaining agreement provided that the Company would pay 100% of the cost of the benefits supplemental to Medicare for pensioners over the age of 65. The 1976 collective bargaining agreement expanded the Company's commitment to include payment of hospitalization and surgical benefits for pensioners between the ages of 62 and 65. Under this agreement, when pensioners reached age 65, the Company became obligated to pay 100% of the cost of their benefits supplemental to Medicare. The 1979 collective bargaining agreement continued both payment of hospitalization and surgical benefits for pensioners between ages 62 and 65 and payment of the cost of benefits supplemental to Medicare for pensioners age 65 and older.

The 1979 collective bargaining agreement was the last ever negotiated between the Company and the union. The Company closed the plant on April 30, 1982, and the collective bargaining agreement between the Company and the union expired on August 31, 1982. Subsequent to August 31, 1982, the Company and the union failed to negotiate a new contract, and the plant has remained closed.

The collective bargaining agreement between the Company and the union consisted of four documents: (1) a basic labor agreement; (2) an insurance agreement; (3) a pension agreement; and (4) a supplemental employment agreement. Here we are concerned only with the Insurance Agreement and the Pension Agreement, and passages in both granted certain health insurance benefits to pensioners.

The Insurance Agreement provided in relevant part:

> Section 3. *Despite anything to the contrary herein contained*, present pensioners who have, prior to August 31, 1976, elected and maintained hospitalization and surgical coverage and those who retire subsequent to that date will, *subject to the conditions hereinafter set forth*, receive medicare complementary coverage on their hospitalization and surgical benefits for the pensioner and his spouse, if any, *during the life of the pensioner* at no cost to the pensioner.
>
> In order to be eligible for the above coverage, employees who reach age sixty-five (65) during the term of this contract, or any extension hereof, and become eligible for pension must decide, on or before three (3) months after said employee's sixty-fifth (65th) birthday, whether to retire or continue to work. If the employee continues to work beyond the three (3) month period, he will be deemed to have waived the provisions of this Section 3 and will not thereafter, during the term of this Agreement, receive insurance coverage as herein set forth in this Section 3.

App. 232 (emphasis added). The Insurance Agreement included a general termination clause providing that the Insurance Agreement remained in effect until August 31, 1982. The Insurance Agreement did not require the Company to set up a fund out of which insurance costs were paid. Rather, the health and welfare benefits of both active employees and pensioners were paid by the Company out of its current income. App. 148.

The Pension Agreement provided in relevant part:

> Article III, Section 1. Any Employee who, at the time of his retirement on or

after February 10, 1979, shall have had at least 10 years continuous service and shall have attained the age of 62 years shall be entitled to receive a pension upon his retirement. The Company will provide and pay for the regular hospitalization and surgical benefits provided by it for any Employee who retires after September 1, 1979, prior to reaching age 65. When said Pensioner reaches age 65, the Company will provide such Pensioner, at the Company's expense, supplemental medicare and major medical benefits. *The Company will continue to provide*, at its expense, supplemental medicare and major medical benefits for Pensioners aged 65 and over.

App. 236 (emphasis added). Unlike the Insurance Agreement, the Pension Agreement provided that the Company would set up and maintain a pension fund to provide the pensions. App. 257. The Pension Agreement further provided that "[a]ny pension properly payable pursuant to this Agreement shall continue to be payable, *notwithstanding the termination or expiration of this Agreement.*" App. 259 (emphasis added).

The district court found, based on its interpretation of the Insurance and Pension Agreements, that plaintiff-retirees were not entitled to insurance benefits beyond the August 31, 1982, expiration of the collective bargaining agreement. Finding ambiguous section 3 of the Insurance Agreement and Article III, section 1 of the Pension Agreement, the district court looked at the agreements in their entirety and interpreted them as providing for termination of the retirees' health insurance benefits simultaneous with the termination of the collective bargaining agreement. Accord-

ingly, the trial court entered judgment for the Company.

## II.   Legal Analysis

### A.   Standard of review

Contract interpretation is a question of law, not subject to the clearly erroneous standard. *Chevron, U.S.A. v. Belco Petroleum Corp.*, 755 F.2d 1151, 1153–54 (5th Cir.1985). Thus, when reviewing the trial court's interpretation of a contract, an appellate court is not limited to the clearly erroneous rule, since a district judge's conclusions of law are freely reviewable by the court of appeals.[1] *Washington Metropolitan Area Transit Authority v. Mergentime Corp.*, 626 F.2d 959, 961 (D.C.Cir. 1980).

### B.   *Yard-Man's* Guidelines Applied

This court dealt with whether retirees' health insurance benefits continued past the expiration of the collective bargaining agreement in *International Union, United Automobile, Aerospace, and Agricultural Implement Workers (UAW), and Local 134 UAW v. Yard-Man Inc.*, 716 F.2d 1476 (6th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). In *Yard-Man*, this court laid out the manner in which a court should proceed when examining the duration of retiree benefits:

> [W]hether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties. Clearly the parties to a collective bargaining agreement may provide for rights which will survive termination of their collective bargaining relationship.... Any such surviving benefit must necessarily find

1.  Evidence was submitted of the actions of the parties with respect to the health benefits provided by the collective bargaining agreement. The district court, however, construing the agreement within its four corners, concluded that the health insurance benefits of the pensioners did not survive the termination of the agreement. In its opinion, the district court did allude to this collateral evidence and, resolving conflicts in the evidence, concluded that the collateral evidence did not support a different result. Even accepting the district court's resolution of the conflicts in this collateral evidence, we still conclude that the collective bargaining agreement unambiguously provides for survival of health insurance benefits. Hence, the decision herein made is one of law to which the clearly erroneous standard of review, Fed.R. Civ.P. 52(a), does not apply.

its genesis in the collective bargaining agreement.

\* \* \* \* \* \*

[T]he court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous. Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor law. This is not to say that the collective bargaining agreement should be construed to affirmatively promote any particular policy but rather that the interpretation rendered not denigrate or contradict the basic principles of federal labor law.

*Yard-Man,* 716 F.2d 1479–80 (citations omitted).[2]

Although *Yard-Man* counseled that courts are to look first at the collective

bargaining agreement when determining whether the parties intended that retiree benefits continue beyond expiration of the agreement, the court also emphasized two factors weighing in favor of finding that retiree benefits survive expiration of the collective bargaining agreement.

First, this court recognized that normally retiree benefits are vested. *Yard-Man,* 716 F.2d at 1482 n. 8. This is true because retirees, with respect to their benefits, are unprotected in the collective bargaining process. Upon expiration of a collective bargaining agreement, a union owes no duty to bargain for continued non-vested benefits for retirees. *Yard-Man,* 716 F.2d at 1482. A union may chose to forego nonvested retiree benefits in future negotiations in favor of more compensation for active employees. The union may not, however, "bargain away retiree benefits which have already vested in particular individuals. Such rights, once vested upon an employee's retirement, are interminable and the employer's failure to provide them [is] actionable under § 301 by the retiree." *Id.* at 1482 n. 8 (citing *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass,* 404 U.S. 157, 181 n. 20, 92 S.Ct. 383, 398 n. 20, 30 L.Ed.2d 341 (1971)). *See also Upholsterers' International Union v. American Pad,* 372 F.2d 427, 428 (6th Cir.1967).

Second, the *Yard-Man* court recognized that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained." *Id.* at 1482.

Thus, when the parties contract for benefits which accrue upon achievement of retiree status, *there is an inference that the parties likely intended those bene-*

**2.** In addition to *Yard-Man,* two other Sixth Circuit cases deal with the nature of retirees' health insurance benefits. *See International Union, United Automobile, Aerospace and Agricultural Implement Workers, Local 784 v. Cadillac Malleable Iron Co.,* 728 F.2d 807 (6th Cir.1984) (affirming the district court's judgment that the employer was obligated to provide health insurance benefits for its retirees without regard to the expiration of the collective bargaining agree-

ment); *Upholsterers' International Union v. American Pad & Textile Co.,* 372 F.2d 427 (6th Cir.1967) (affirming the trial court's grant of summary judgment for retirees who were challenging the discontinuance of their insurance benefits).

The Ninth Circuit also addressed the issue of retiree insurance benefits. *See Bower v. Bunker Hill Co.,* 725 F.2d 1221 (9th Cir.1984).

*fits to continue as long as the beneficiary remains a retiree.*

*Id.* (emphasis added). *See also International Union, United Automobile, Aerospace and Agricultural Implement Workers, Local 784, Cadillac Malleable Iron Co.,* 728 F.2d 807, 809 (6th Cir.1984).

### III. Collective bargaining agreement not ambiguous

■ Consistent with *Yard-Man's* guidelines, our review begins with an examination of the Insurance Agreement and Pension Agreement portions of the collective bargaining agreement. From our study of these agreements, we find that section 3 of the Insurance Agreement, read in its entirety, unambiguously confers lifetime health insurance benefits on Company pensioners. Moreover, we find that Article III, section 1 of the Pension Agreement also provides lifetime health insurance benefits for certain pensioners. Each of these provisions will be discussed separately.

### A. Section 3 of the Insurance Agreement unambiguously confers lifetime health insurance benefits on pensioners

The court finds that section 3 of the Insurance Agreement plainly confers lifetime health insurance benefits on covered pensioners.[3] First, the phrase "despite anything to the contrary herein contained" appears to the court to refer to the Insurance Agreement's duration clause's provision terminating the Insurance Agreement as of August 31, 1982. Under this interpretation, a pensioner's health insurance benefits would continue during his lifetime despite the duration clause's provision "to the contrary" that the collective bargaining agreement terminated August 31, 1982. Second, the court finds that the phrase "subject to the conditions hereinafter set forth" refers to paragraph 2 of section 3. Paragraph 2 provides that an employee who is eligible for a pension, but who continues to work more than three months past his sixty-fifth birthday, is deemed to have waived the pensioner insurance coverage provided in paragraph 1 of section 3. Thus reading section 3 as a whole, "the conditions hereinafter set forth" are that a pension-eligible employee must choose within three months of his sixty-fifth birthday whether to retire or to continue to work. If he chooses to continue to work, then he has not met the conditions that would have made him eligible for benefits supplemental to Medicare.

Section 3 provides health insurance coverage "for the pensioner and his spouse, if any, during the life of the pensioner at no cost to the pensioner." This clearly means that a pensioner will receive health benefits for the remainder of his life, regardless of when the collective bargaining agreement expires, but that a pensioner's spouse is eligible for health benefits only as long as the pensioner lives. In addition to assuring that the pensioner would receive health benefits for life, another reason for including such language in the Insurance Plan is to make clear that, in contrast to pension benefits, a spouse's insurance benefits cease upon the pensioner's death. Under the Pension Agreement, pension benefits could continue to be paid to a retiree's survivor. Our interpretation of the phrase "for the pensioner and his spouse ... during the life of the pensioner ..." is consistent with *Yard-Man.* There this court in-

---

**3.** Section 3. *Despite anything to the contrary herein contained,* present pensioners who have, prior to August 31, 1976, elected and maintained hospitalization and surgical coverage and those who retire subsequent to that date will, *subject to the conditions hereinafter set forth,* receive medicare complementary coverage on their hospitalization and surgical benefits for the pensioner and his spouse, if any, *during the life of the pensioner* at no cost to the pensioner.

In order to be eligible for the above coverage, employees who reach age sixty-five (65) during the term of this contract, or any extension hereof, and become eligible for pension must decide, on or before three (3) months after said employee's sixty-fifth (65th) birthday, whether to retire or continue to work. If the employee continues to work beyond the three (3) month period, he will be deemed to have waived the provisions of this Section 3 and will not thereafter, during the term of this Agreement, receive insurance coverage as herein set forth in this Section 3.

terpreted a similar duration provision which stated "in the event of death of the retiree who is age 65, the Company will continue to insure the surviving spouse and dependent children of the retiree until 6/1/77 [expiration of the collective bargaining agreement]." 716 F.2d at 1481, n. 6. The *Yard-Man* court found the most reasonable interpretation to be "that the spouse-dependent child provision was meant as an exception to the anticipated continuation of benefits beyond the life of the collective bargaining agreement." *Id.* at 1481. So here, the limitation of the duration of the spouse's benefits to the life of the pensioner creates an inference that the pensioner's benefits continue for life, not for the remainder of the collective bargaining agreement.

### B. Article III, section 1 of Pension Agreement not ambiguous

Article III, section 1 of the Pension Agreement states:

> Any Employee, who at the time of his retirement on or after February 10, 1979, shall have had at least 10 years continuous service and shall have attained the age of 62 years shall be entitled to receive a pension upon his retirement. The Company will provide and pay for the regular hospitalization and surgical benefits provided by it for any Employee who retires after September 1, 1979, prior to reaching age 65. When said Pensioner reaches age 65, the Company will provide such Pensioner, at the Company's expense, supplemental medicare and major medical benefits. The Company will continue to provide at its expense, supplemental medicare and major medical benefits for Pensioners aged 65 and over.

The court finds that this section unambiguously confers the stated health insurance benefits for the duration of the retiree's life. To interpret the section otherwise would render the Company's promise in substantial part nugatory and illusory. For example, if a sixty-two year old employee with twenty years service retired on January 1, 1982, eight months before the

collective bargaining agreement expired, and if the Company were correct in contending that the retiree's health insurance benefits ceased with the August 31, 1982, expiration of such agreement, then the Company's promise to provide supplemental Medicare and major medical benefits to the retiree when he reached age sixty-five would be of no value. The court therefore finds that under Article III, section 1 of the Pension Agreement retiree health benefits survive expiration of the collective bargaining agreement.

The district court, however, went beyond these two contract provisions and read into other portions of the collective bargaining agreement the intent not to confer lifetime health benefits on retirees.

### IV. Bases of the district court's interpretation

#### A. Funding of pension benefits vs. nonfunding of insurance benefits

In the case at bar, the Pension Agreement established a pension fund as a means of insuring that pension benefits would be paid regardless of future contingencies. In contrast, the Insurance Agreement did not provide a mechanism for funding pensioners' health insurance benefits. The district court inferred from the Pension Agreement's provision for funding pension benefits and from the Insurance Agreement's failure to fund health benefits that, if the parties had intended that the health insurance benefits survive the expiration of the collective bargaining agreement, then the parties would have provided for a health insurance *fund.* This appears to us to be a meager basis for overriding the clear meaning of section 3 of the Insurance Agreement and of Article III, section 1 of the Pension Agreement. In any event, the district court's inference is in conflict with *Yard-Man.* In *Yard-Man,* as in this case, the pension plan was funded while the insurance plan was not funded, and the *Yard-Man* court found that the failure to provide a mechanism for funding retiree health benefits "does not necessarily imply that retiree benefits were not intended to

survive the [collective bargaining] agreement." *Id.* at 1482 n. 7. The *Yard-Man* court went on to hold, of course, that retirees' health benefits "were intended to outlive the collective bargaining agreement's life." *Id.* at 1482–83.

## B. Failure to include express continuation clause in Insurance Agreement

The collective bargaining agreement explicitly provided that *pension* benefits would "continue to be payable, notwithstanding the termination or expiration" of the collective bargaining agreement; but no similar provision was made concerning *health insurance* benefits. The district court focused on this clause continuing pension benefits past the expiration of the collective bargaining agreement, and the court inferred that the absence of a similar duration clause applicable to insurance benefits meant that the parties did not intend the insurance benefits to survive the collective bargaining agreement. This inference would be quite plausible if the Insurance Agreement did not expressly provide for lifetime health insurance benefits for retirees. Moreover, drawing this inference is somewhat in conflict with this court's reasoning in *Yard-Man*. As heretofore stated, the *Yard-Man* collective bargaining agreement expressly provided a method for continuing pension benefits past the expiration of the collective bargaining agreement, but the agreement failed to make similar provision for health benefits. Yet, this court still found that the parties intended the health insurance benefits to survive expiration of the collective bargaining agreement. 716 F.2d at 1482 n. 7.

## C. Ambiguity of "during the life of the pensioner"

The district court indicated that the words in section 3 of the Insurance Agreement "will ... receive medicare complementary coverage on their hospitalization and surgical benefits for the pensioner and his spouse, if any, during the life of the pensioner at no cost to the pensioner" were ambiguous. The court inferred that the words "during the life of the pensioner" were inserted only to make clear that the spouse would receive benefits during the pensioner's life, not to grant lifetime benefits to the pensioner. Thus, the sole effect of the phrase "during the life of the pensioner" would be to limit the spouse's right to benefits to the life of the pensioner. This interpretation does not make sense, because if it were correct, then it would follow that the phrase "at no cost to the pensioner" would likewise only apply to the spouse, with the anomalous result that benefits to the spouse would be without cost but the pensioner would be required to pay for the pensioner's benefits.

## D. Vested nature of retiree benefits

This court has recognized, as stated, that retiree benefits normally vest as a matter of course upon an employee's retirement and are interminable. *Yard-Man*, 716 F.2d at 1482 n. 8. The district court failed to give effect to this proposition.

## E. Status nature of retirees' benefits

Finally, the district court failed to give effect to this court's admonition that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained." *Id.* at 1482. *See also Cadillac Malleable Iron Co.*, 728 F.2d at 809. Plaintiff retirees are entitled to the inference on their behalf that the Company and the union intended the health insurance benefits to continue as long as the retirees remained retired. *Yard-Man*, 716 F.2d at 1482.

We therefore conclude that the clear meaning of section 3 of the Insurance Agreement and Article III, section 1 of the Pension Agreement is neither rendered ambiguous nor overriden by the other provisions of these agreements relied on by the district judge.

## V. Other claims

Plaintiffs asserted two other bases for relief. The first claim was brought pursuant to ERISA; plaintiffs basically contend-

ed that when a collective bargaining agreement is ambiguous, ERISA's public policy of protecting employee benefit plans creates a strong presumption that the parties intended retiree insurance benefits to continue past the expiration of the agreement. The second claim was based on an estoppel argument that because Company officials told retiring employees that they would receive lifetime health insurance benefits, the Company was estopped to deny coverage under the collective bargaining agreement. In view of our preceding analysis of the collective bargaining agreement and the result we reached, we decline to address these two issues.

## VI. Eligibility of "70/80 retirees" for health insurance benefits

■ In the foregoing analysis we have found that certain pensioners are granted lifetime health insurance benefits under Article III, section 1 of the Pension Agreement. Nevertheless, the Company contends that a particular group of retirees, termed "70/80 retirees," are not eligible for health insurance benefits. Since plaintiff William Driscoll is a 70/80 retiree, we address the issue whether 70/80 retirees are eligible for lifetime health insurance benefits.[4]

Article III of the Pension Agreement is entitled "Eligibility Requirements" and is divided into four sections, each of which deals with a different category of potential retirees. The 70/80 retirees are defined in section 4 of Article III, as follows:

4. Any participant who shall have had at least 15 years continuous service and (i) shall have attained the age of 55 years and whose combined age and years of continuous service shall equal 70 or more or (ii) whose age and years of continuous service shall equal 80 or more, and

(a) whose continuous service is broken by reason of a permanent shutdown of a plant, department or subdivision thereof

or by reason of a layoff or physical disability,

\*     \*     \*     \*     \*     \*

shall be eligible to retire on or after September 1, 1979 and shall upon his retirement (hereinafter "70/80 retirement") be eligible for a pension.

Section 4, dealing with 70/80 retirees, makes no reference to health insurance benefits. According to the Company, this is evidence of the parties' intent that only section 1 pensioners receive health insurance benefits. According to the Company, prior to the plant shutdown there had never been any 70/80 retirees and therefore the Company has never provided health insurance benefits for 70/80 retirees. The Company argues that even if the court is correct in finding that the other group of pensioners is entitled to lifetime health insurance benefits, 70/80 retirees are not eligible for these benefits because their rights are governed by Article III, section 4 of the Pension Agreement, rather than by Article III, section 1. We find, however, that this is too narrow a reading of the Pension Agreement and hold that the Pension Agreement read as a whole grants health insurance benefits to 70/80 retirees.

In determining that 70/80 retirees are entitled to health insurance benefits, we first look to section 1 of Article III of the Pension Agreement, which states in pertinent part:

The Company will provide and pay for the regular hospitalization and surgical benefits provided by it for *any Employee* who retires after September 1, 1979, prior to reaching age 65. When said *Pensioner* reaches age 65, the Company will provide such *Pensioner,* at the Company's expense, supplemental medicare and major medical benefits. The Company will continue to provide, at its expense, supplemental medicare and major medical benefits for *Pensioners* aged 65 and over.

---

4. Since the district court determined that no retirees were entitled to health benefits past the expiration of the collective bargaining agree-

ment, it did not address the Company's separate defense with respect to 70/80 retirees.

App. 236 (emphasis added). Thus, section 1 provides that the Company will grant certain health insurance benefits to *"any* Employee who retires after September 1, 1979, prior to reaching age 65." Nothing in the Pension Agreement limits the health insurance benefits conferred in Article III, section 1 to employees who retire after reaching age sixty-two. Rather, section 1's broad grant of health insurance benefits to "any" employee who retires before reaching age 65 applies equally to 70/80 retirees. Moreover, the Pension Agreement defines "pensioner" as "any person who is retired from employment with the Company and is receiving or is eligible to receive a pension under the terms of this Plan." A 70/80 retiree is eligible for a pension under the terms of Article III, section 4; thus a 70/80 retiree is a "pensioner" under the Pension Agreement. This is significant because section 1 of Article III confers health insurance benefits on "pensioners" and does not distinguish between 70/80 pensioners and other pensioners. Since 70/80 retirees are pensioners within the definition of the Pension Agreement, the court finds they are intended to be recipients of this health insurance coverage. We believe the Company's interpretation of the Pension Agreement, which would exclude 70/80 retirees from eligibility for health insurance benefits, is contrary to both the spirit and the plain meaning of the collective bargaining agreement.

The Company also contends that, since Driscoll applied to retire in July, 1982, after the plant had closed in April, 1982, Driscoll was no longer an "employee" when he "retired," and therefore he is not eligible for retiree insurance benefits. In making this argument, the Company relies on this circuit's decision in *Schneider v. Electric Auto-Lite Co.,* 456 F.2d 366 (6th Cir.1972).

Having considered the *Schneider* case, we hold that it has no application to the situation presented here. First, the *Schneider* court was not only construing a different collective bargaining contract between the parties before it; the court was dealing with a specific factual and contractual situation and was not setting out general legal propositions that would govern the situation before us. We must be guided by the collective bargaining agreement negotiated between the parties involved. Having considered the agreement between the Company and the union, we find that the terms of their collective bargaining agreement demonstrate that the parties contemplated that long-time employees faced with a permanent plant shutdown would have the option of retiring. It appears to the court that the major purpose of 70/80 retirement is to allow such employees, ordinarily not eligible for retirement, to retire when faced with permanent shutdown of the plant. The Company's argument that after the plant shutdown the employees were no longer "employees" and thus could not "retire" would render nugatory the provision for 70/80 retirement, which by definition can occur only when there is a permanent plant shutdown or layoff.

## VII. Conclusion

With regard to plaintiff Chufo, who retired in 1977 because of a disability, we remand his claim to the district court with instructions to dismiss his claim with prejudice in light of his abandoning his claim at oral argument before this court.

With regard to plaintiffs Policy and Driscoll, we hold as a matter of law that the health insurance benefits granted plaintiffs Policy and Driscoll survived expiration of the collective bargaining agreement between Powell Pressed Steel Company and the United Steelworkers. We vacate the trial court's grant of judgment in favor of defendant Powell Pressed Steel Company and remand the action for further proceedings consistent with this opinion, including entertainment of plaintiffs' motion for class certification and consideration of the issue of damages.