Elvin **JANSEN** and Edward J. Schaecher, et al., Plaintiffs,

v.

The **GREYHOUND CORPORATION** and Armour and Company, Defendants.

No. C 84–4122.

United States District Court, N.D. Iowa, W.D.

Jan. 14, 1987.
On Motion to Amend May 12, 1987.

P.L. Nymann, Steve C. Kohl, Sioux City, Iowa, William H. Bruckner, Houston, Tex., for plaintiffs.

Joseph F. DuBray, Sioux City, Iowa, James S. Petri, Lawrence Summers, Chicago, Ill., Jeffrey L. Bishop, Charlotte, N.C., for defendants.

## ORDER

DONALD E. O'BRIEN, Chief Judge.

This case involves a class action brought by representatives of certain retirees of Armour and Company (Armour) and Armour Food Company (AFC) who seek:

(a) Clarification of the rights of the retirees to future benefits due under a health and welfare insurance plan;

(b) Recovery of benefits due retirees under the plan;

(c) Damages for premiums paid by retirees to obtain substitute coverage;

(d) Permanent injunctive relief prohibiting defendants from making changes in the plan; and

(e) Costs, including reasonable attorneys' fees, and interest.

The defendants are Armour and the Greyhound Corporation (Greyhound) and this action is brought under the Employee Retirement Income Security Act (ERISA). Jurisdiction is founded on 29 U.S.C. § 1132(e).

A trial in this matter was held on June 10, 1986 through June 12, 1986, with post-trial submissions having been filed November 14, 1986. For the reasons set forth herein, this Court holds that the retirees received lifetime health insurance benefits, which cannot be altered without the retirees' consent. The defendants are enjoined from changing the retiree health insurance benefits that existed prior to March 15, 1984, and damages incurred by the plaintiff class will be determined at a future date.

## BACKGROUND

The named plaintiffs, Elvin Jansen and Edward J. Schaecher, are representatives of a class consisting of all retired bargaining unit employees of Armour and Company and Armour Food Company who worked under a Master Agreement between Armour and Company and the United Food and Commercial Workers Union or the Amalgamated Meat Cutters and Butcher Workmen

of America.[1] Plaintiff class members worked in meat packing plants located across the country and operated by Armour/AFC.

The plaintiff class members have been receiving for many years hospital and medical benefits under an "Employee Welfare Benefit Plan" within the meaning of ERISA, 29 U.S.C. § 1002(1) and (3). Armour, a wholly-owned subsidiary of Greyhound since 1971, has been the "Plan Sponsor" and Greyhound the "Administrator" within the meaning of ERISA, 29 U.S.C. § 1002(16)(A) and (B).[2] Armour withdrew from the meat packing business in December 1983, and since that date, officers and employees of Greyhound have managed the Employee Welfare Benefit Plan.

By letter dated February 1984, the plaintiff class was informed that benefits under the Employee Welfare Benefit Plan were being changed by defendants, effective March 15, 1984. The changes were:

#### Prior Plan

1. Major Medical coverage was subject to a $300 integrated deductible. An integrated deductible means that certain expenses for which the plan reimbursed the retiree could also be applied toward the Major Medical deductible.

2. After the Major Medical deductible was satisfied, the plan paid 80% of covered expenses.

3. No Stop Loss Provision.

4. Major Medical coverage was limited to a maximum of $50,000 per cause.

5. Charge of $1.75 was assessed for each prescription filled.

6. For retirees eligible for vision care coverage, there was no deductible.

7. The plan paid the difference between the billed covered expense and the Medicare payment if the difference did not exceed the plan benefit for the covered expense determined as if no Medicare benefits were payable.

#### Present Benefits

1. Comprehensive Medical coverage is subject to a $150 deductible which is not integrated. This means that no expenses for which the plan reimburses the retiree are applied toward the deductible.

2. In each calendar year, after the deductible is satisfied, the plan pays 80% of covered expenses to $2500 and 100% of covered expenses over $2500.

3. Stop Loss Provision whereby a retiree will not be required to pay more than $650 ($800 per family) per calendar year for covered expenses.

4. Comprehensive coverage provides a maximum lifetime benefit of $5 million for all causes.

5. No charge is assessed for mail order prescriptions; $2.00 charge is assessed for each prescription filled by other means.

6. For retirees eligible for vision care coverage, there is a $10 deductible for certain covered expenses.

7. The plan pays the difference between the Medicare payment and the plan benefit for the covered expense.[3]

---

1. Pursuant to the March 28, 1986 Notice by this Court, nineteen class members intervened and were represented by counsel at trial.

2. No claims administration function is performed by AFC. AFC was sold by Greyhound to ConAgra, Inc. several months before the retiree benefits were reduced. This Court therefore dismissed AFC in an Order entered February 27, 1986.

3. This summary includes benefit modifications made in October 1984.

The named plaintiffs, each a resident of the Northern District of Iowa, filed this action on June 29, 1984. This Court certified a class of approximately 5200 members on February 27, 1986 under Fed.R. Civ.P. 23(b)(2). The Court additionally required notification to all class members under Fed.R.Civ.P. 23(d)(2) and ordered plaintiffs' request for a preliminary injunction be combined with a trial on the merits.[4]

### FINDINGS OF FACT

Medical benefit coverage for active and retired hourly employees covered by Master Agreements between Armour and the UFCW historically has been the subject of collective bargaining between Armour and the Union. Appendix G to the Master Agreement has described the medical benefits for active employees; Section 18.7 of the Master Agreement has described the medical benefits for retirees.

The earliest collective bargaining agreement submitted as evidence was the 1959 Master Agreement. As successive agreements were negotiated, employee welfare benefits and welfare benefits of retirees increased. Retirees lagged one or more contracts behind active employees with respect to the medical benefits provided by Armour. For example, Section 18.7 of the 1976 Master Agreement states that medical benefit coverage for employees retiring on or after September 1, 1976 shall be as set forth in Appendix G to the 1973 Master Agreement; Section 18.7 of the 1979 Master Agreement states that medical benefit coverage for employees retiring on or after September 1, 1979, shall be as set forth in Appendix G to the 1976 Master Agreement.

Contemporaneous with the execution of new Master Agreements, Armour has from time to time made improvements in the medical insurance benefits of persons already retired. By agreement with the UFCW dated August 31, 1979, Armour stated:

> [W]e confirm that any pamphlet or other writing setting forth or describing employment benefits which are contained in or derived from the Master Agreement (including insurance and pension benefits) which the Company distributes or makes available to current or retired employees shall state prominently that the benefits so described are provided as a result of collective bargaining with the Union and shall designate the Union by name.

The Court finds that the improvements in the medical benefits of persons already retired were bargained for by requesting and receiving modifications of then existing contractual obligations, and are binding on the defendants. The improvements could not be rescinded without the consent of the affected retirees.

Section 18.7 of the 1979 Master Agreement provides that the retiree medical insurance shall continue at least until the death of the retiree, and that, under certain circumstances, the coverage would continue until the death or remarriage of the retiree's surviving spouse. The Court construes the 1979 agreement as awarding lifetime medical insurance benefits to retirees.

---

**4.** At the trial, the Court reserved ruling on several exhibits offered by plaintiffs and defendants and received offers of proof as to the testimony of actuary Wendell Brown and the decisions and documents relating to arbitration proceedings between Armour and the United Food and Commercial Workers Union.

The testimony of Mr. Brown has been admitted and considered by the Court, as have the decisions and documents, Exhibits P, Q and R, relating to the arbitration proceedings. The actuarial studies for the years 1984 and 1985 by Greyhound's actuarial firm, Exhibits 7 and 8, have been admitted and considered. Exhibit 9, the agreement of sale of the Armour/AFC meat packing plants, has been admitted and con-

sidered. The Court also has received and considered Exhibit T offered by defendants, selected pleadings from *Snyder v. Armour and Company*, No. C–C–85–621–P (W.D.N.C.).

Plaintiffs' Exhibits 4a and 4b, Greyhound's annual reports, have been considered to be unpersuasive. The Court is persuaded that the alleged "admissions" of defendants concerning the lifetime nature of the benefits at issue here contained in the annual reports are not relevant evidence binding on the defendants in this cause. The defendants' objections to the reports are sustained. Defendants' objections to Exhibits 14, 15 and 16, correspondence regarding the arbitration, are denied, and those exhibits have been admitted and considered.

Any ambiguity as to the intended duration of the retiree medical insurance benefits is convincingly resolved by the consideration of parol evidence. In numerous exit interviews and letters, Armour assured its retirees that their medical insurance benefits would continue for life. The letters (Exhibits 3a through 3o) clearly set out the parties' intent that the medical insurance benefits were to be lifetime benefits, and demonstrate that Armour had previously construed the collective bargaining agreements in that fashion. Several of these letters state in pertinent part: "The various benefits for you and your eligible dependents, if any, will be cancelled as of the end of the month in which your death occurs." At no point did Armour reserve the right to reduce or terminate a retiree's medical insurance benefits after retirement before a retiree's death. Armour's contention that its letters indicate that the benefits could be canceled at the termination of a collective bargaining agreement is not supported by the evidence and is not persuasive.

The Court finds that it was the parties' intent and understanding that the retiree medical insurance benefits provided under the 1979 agreement were to continue undiminished for the lifetime of the retirees.

On December 17, 1983, Armour closed all of its 16 meat packing plants and sold all of its assets in that industry to ConAgra, Inc., a company headquartered in Omaha, Nebraska. Under the terms of the sale, Armour retained all liabilities for pension and retirement insurance benefits. (Exh. 9, pp. 43–44).

Armour immediately became concerned about the cost of its retiree insurance liabilities and requested its actuarial firm Towers, Perrin, Forster & Crosby ("TPF & C") to calculate the medical insurance plan liabilities for its closed operations. A meeting was held in early January of 1984 with TPF & C to begin these calculations. The results were put in a report issued in February 1984. In that report, which was specifically adopted by Armour, TPF & C noted:

> Greyhound requested that TPF & C use 12% annual investment return and 6% annual medical trend assumptions for calculating liabilities. Greyhound has justified these rates to TPF & C by indicating 12% reflects a reasonable internal rate of return for a "book reserve" item, and medical benefits will be "managed" (by benefit or employee contribution changes) to result in company medical benefit cost increases of approximately 6% per year.[5]

(Exh. 7, p. 9). TPF & C cautioned in that report that "the medical inflation rate will require active 'management' of plan costs to meet the assumptions; Greyhound indicated they planned to 'manage' post retirement medical benefit liabilities." (Exh. 7, p. 2). TPF & C conducted a similar study on the plans in 1985, and its February 1985 report contained identical language insofar as the "managing" of medical benefits was concerned. (Exh. 8, p. 2). TPF & C specifically noted in both reports that "medical coverage continues for the life of each covered individual". (Exh. 7, p. 3; Exh. 8, p. 4).

In February 1984, Armour began "managing" the retiree medical insurance benefits. It notified all retirees and participants in its medical insurance plan for hourly employees that:

> Effective March 15, 1984, the benefits plan which you have enjoyed as an Armour and Company retiree will be redesigned to reflect current levels of medical, prescription, and if applicable, vision care plan benefits provided to other companies of the food industry.

(Exh. 5).

The Court finds that the retirees' medical insurance benefits were significantly reduced by the changes implemented in March 1984. The major adverse change in the benefits package under the new plan was described as "the Medicare carve-out."

---

**5.** Greyhound based the 12% annual investment return and 6% annual medical trend assumption on its own economic forecasts.

As provided in the 1979 agreement, the Armour plan benefits and Medicare benefits were coordinated to provide, in many instances, 100% coverage. For example, if Medicare paid 70% of a particular claim and the Armour plan would pay 30% or more of the same claim as determined in the absence of Medicare coverage, then the retiree would be reimbursed 30% by the Armour plan. The retiree in this instance would receive a total of 100% reimbursement of his medical expenses.

In March 1984, the defendants repudiated their obligations under the 1979 agreement in favor of "managing" benefits to maintain costs below a predetermined level. This placed the entire retiree medical insurance benefit plan at risk of unilateral changes by the administrator at any time.

Under the changes implemented in March 1984, the Armour plan takes credit for or "carve[s] out" from its own coverage whatever Medicare pays on a covered claim. For example, if Medicare paid 70% of a particular claim and the Armour plan would pay 80% of the expense of the same claim absent Medicare coverage, then the Armour plan would pay only the difference between 80% and 70%, or just 10% of the expense of that claim. Since the retiree would be covered for only a total of 80%, the retiree would thus pay 20% of the claim under the new plan in this example. If the Armour plan benefit for a claim (determined independently) would be less than or equal to the Medicare benefit for the same claim (determined independently), then the Armour plan introduced in March 1984 would pay nothing. It is called a "Medicare carve-out" because Medicare benefits wipe out dollar for dollar any benefits that would otherwise be covered by the Armour plan. Thus, Armour really benefits when a retiree takes Medicare, instead of the retiree.

It is clear that the changes introduced in March 1984 would, if left in place, reduce the medical insurance benefits otherwise paid to the class members during their lifetime by several million dollars. Plaintiffs' expert witness estimated the projected present value loss to the class as being slightly in excess of twenty-three million dollars. Defendants' expert estimated the present value loss as of January 1, 1986 to be $3.4 million. Very clearly, the plaintiff class has been damaged by the changes to the plan.

Both Greyhound as plan administrator and Armour as plan sponsor owe a fiduciary duty to the plaintiff class. This duty includes an obligation to furnish retiree medical insurance benefits in accordance with the terms of the 1979 agreement. These benefits cannot be reduced without the consent of retirees. Armour's March 1984 reduction in benefits without the consent of the retirees was a breach of its fiduciary duty. Greyhound directed its subsidiary Armour to carry out this reduction; this too was a breach of fiduciary duty. Moreover, Greyhound failed to file with the Secretary of Labor and distribute to retirees a timely summary plan description as required by 29 U.S.C. § 1021.

The purpose of distributing the summary plan description is so that "the individual participant knows exactly where he stands with respect to the plan—*what benefits he may be entitled to,* what circumstances may preclude him from obtaining benefits, what procedures he must follow to obtain benefits, and who are the persons to whom the management and investment of his plan funds have been entrusted." H.R.No. 93–533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News at 4639, 4649 (emphasis supplied). The defendants' in-house counsel, Norbert Anderson, testified that they were just too busy to comply with the statutory mandate of § 1021.

There was absolutely no reliable indication in any of the evidence that Armour had reserved a right to decrease retiree welfare benefits without the consent of the retirees. The failure to distribute to retirees the required summary plan description reserving such a right before benefits were reduced makes the defendants' case even less persuasive.

Subsequent to the filing of this action in June 1984, the UFCW and Armour participated in arbitration proceedings concerning

Armour's departures from the 1979 collective bargaining agreement. These proceedings concerned several issues in addition to the changes in retiree medical insurance benefits. The retirees who compose the membership of the class in this action were not parties to those arbitration proceedings, and were not, at the time of those proceedings, employees or union members. Indeed, the evidence is clear and this Court finds that plaintiff class members were not even notified that the arbitration proceedings were taking place. The class members are in no way bound by the result of the arbitration proceedings.

## CONCLUSIONS OF LAW

■ Basic contract interpretation principles apply to the interpretation of collective bargaining agreements. A court should interpret each provision in question "in light of its language, its context, and any other indicia of the parties' intent." *Randall v. Lodge No. 1076 Intern. Ass'n, Etc.,* 648 F.2d 462, 466 (7th Cir.1981). Where ambiguities exist, the Court must seek guidance from other words and phrases found in the collective bargaining agreement, *UAW v. Yard–Man, Inc.,* 716 F.2d 1476, 1480 (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984), and parol evidence, *Local No. 150–A, UFCW v. Dubuque Packing Co.,* 756 F.2d 66, 69 (8th Cir.1985).

■ These principles support this Court's interpretation of Section 18.7, the retiree health benefit section, and the 1979 Master Agreement. Nowhere in the section is there any statement that medical benefits for retirees shall end before their deaths. In fact, the Court has found that Defendants Greyhound and Armour never reserved any right to reduce or terminate medical benefits for retirees and their eligible dependents. Section 18.7(f)(ii) provides for lifetime medical benefits for surviving spouses of retirees who do not remarry, if a retiree dies and previously had selected the survivor benefit option. The Court believes that it is inconceivable that the Defendants Greyhound and Armour would maintain that they can reduce or terminate benefits for retirees at will when the contract specifies that a retiree's spouse shall have lifetime medical benefits. *See Policy v. Powell Pressed Steel Co.,* 770 F.2d 609, 616 (6th Cir.1985).

The defendants contend that the contract termination clause, Article XXVI of the 1979 Master Agreement, allows the administrator to terminate the retiree's health care benefits at the termination of the Agreement. It states: "This agreement shall remain in effect until Aug. 31, 1982, and from year to year thereafter...." The Court rejects the defendants' contention. Such contract construction would nullify the more specific language regarding Section 18.7(f)(ii) which contemplates lifetime benefits.

■ Furthermore, the case law from this circuit and other circuits holds that retiree health insurance benefits cannot be reduced or terminated by the plan administrator/employer where no such reduction or termination right was reserved or intended by the parties. In a similar class action filed against another meat packer, an Eighth Circuit panel held that retirees of the Dubuque Packing Company were entitled to lifetime health benefits under the 1979 collective bargaining agreement. *Dubuque Packing Co., supra,* 756 F.2d at 69–70. Like Armour retirees, there was evidence that past employees of Dubuque Packing were advised that they would receive lifetime benefits. Likewise, there was no evidence that the parties agreed to terminate retirees' benefits at any time or that retirees' benefits were tied to renewal of the collective bargaining agreements.

In *Yard–Man, supra,* the Sixth Circuit has thoroughly analyzed the concept of retiree benefits in concluding that retiree health insurance benefits are "status benefits" whose lifetime duration may be implied both from the context of their creation and the fact that the recipients are retirees. The court stated as follows:

Finally, examination of the context in which these benefits arose demonstrates the likelihood that continuing insurance benefits for retirees were intended. Benefits for retirees are only permissive not

mandatory subjects of collective bargaining. [*Allied Chemical and Alkali Workers of America v.*] *Pittsburgh Plate Glass Co., supra,* 404 U.S. [157] at 181–82, 92 S.Ct. [383] at 398–99 [30 L.Ed. 2d 341 (1971)]. As such, it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to contingencies in future negotiations [citations omitted]. The employees are presumably aware that the union owes no obligation to bargain for continued benefits for retirees. If they forego wages now in expectation of retiree benefits, they would want assurance that once they retired they would continue to receive such benefits regardless of the bargain reached in subsequent agreements. Contrary to Yard–Man's assertions, the findings of an intent to create interminable rights to retiree insurance benefits in the absence of explicit language, is not, in any discernible way, inconsistent with federal labor policy. Further, retiree benefits are in a sense "status" benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained.

716 F.2d at 1482. *See also UAW v. Cadillac Malleable Iron Co.,* 728 F.2d 807 (6th Cir.1984); *Upholsterers' Union v. American Pad & Textile Co.,* 372 F.2d 427 (6th Cir.1967); *Bower v. Bunker Hill Co.,* 725 F.2d 1221 (9th Cir.1984); *Weimer v. Kurz–Kasch, Inc.,* 773 F.2d 669 (6th Cir.1985); *Musto v. American General Corporation,* 615 F.Supp. 1483 (M.D.Tenn.1985).

As this Court found in its Findings of Fact, many retirees were informed in writing at retirement (*See* Exh. 3 series) and orally in exit interviews that they would receive health insurance benefits for life. Over the years, Armour consistently extended any benefits negotiated in collective bargaining for future retirees to past and present retirees. No evidence shows that prior to the 1984 benefit reduction, Armour ever reserved the right to terminate or reduce retiree health insurance benefits in any document. Furthermore, none of the collective bargaining agreements between the Union and Defendant Armour contains any language specifically limiting the duration of retirees' benefits. This Court can only conclude on the basis of such evidence and the case law that retirees and their eligible dependents are entitled to health insurance benefits for life.

There remains the attempted arbitration of the retirees' rights to health insurance benefits by the Union and Armour. Courts have looked with a jaundiced eye upon labor-management negotiation of benefits for those workers who have already retired. In *Allied Chemical and Alkali Workers Local No. 1 v. Pittsburgh Plate Glass Company,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), the Supreme Court held that because retirees were not "employees", bargaining for their benefits was a permissive subject. Indeed, the Court stated that:

> Since retirees are not members of the bargining (sic) unit, the bargaining agent is under no statutory duty to represent them in negotiations with the employer.... This does not mean that when a union bargains for retirees—which nothing in this opinion precludes if the employer agrees—the retirees are without protection. Under established contract principles, vested retirement rights may not be altered without the pensioner's consent. (Citation omitted.) The retiree, moreover, would have a federal remedy under § 301 of the Labor Management Relations Act for breach of contract if his benefits were unilaterally changed....

404 U.S. at 181 n. 20, 92 S.Ct. at 398 n. 20.

Along this same line, the Eighth Circuit has said:

> The right to receive health and welfare benefits arises from the retiree's status as a past employee.... The status of a retiree cannot be affected by future negotiations or agreements between the Company and a Union.

*Dubuque Packing Co., supra,* 756 F.2d at 70. *See also Anderson v. Alpha Portland Industries, Inc.,* 752 F.2d 1293, 1298–1300 (8th Cir.1985), *affirming en banc,* 727 F.2d 177 (8th Cir.1984), *rev'g,* 558 F.Supp. 913

(E.D.Mo.1982), *cert. denied,* 471 U.S. 1102, 105 S.Ct. 2329, 85 L.Ed.2d 846 (1985) (*rejecting* an employer's argument that once a union chose to bargain on behalf of retirees it also had authority to represent retirees in grievance and arbitration proceedings). The defendants' contention that the retirees are bound by the arbitration proceedings is rejected.

■ The Court notes that when enacting ERISA, Congress declared a policy of protecting employee benefit plan participants by providing federal court access. As the Supreme Court noted, "the expertise of arbitrators is in the 'law of the shop, not the law of the land' ", *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 57, 94 S.Ct. 1011, 1024, 39 L.Ed.2d 147 (1974), and arbitration might not result in a final decision. *Anderson,* 752 F.2d at 1300. Plaintiff class members neither requested that the issue of retiree health insurance be submitted to arbitration nor agreed to be bound by the arbitrator's decision. Nor were the class members parties to or represented at the arbitration proceedings between the Union and Defendant Armour. Indeed, the plaintiff class members were not even notified that the arbitration proceedings were taking place. This Court holds that plaintiff class members are not, therefore, bound by any of the arbitration proceedings between the Union and Armour. *Anderson, supra,* 752 F.2d at 1298.

This makes clear the scope of the UFCW's authority with respect to the retirees. The Union could, if the parties chose to enter into such bargainings, negotiate improvements in the medical insurance benefits of persons already retired. It has no authority, however, to agree to reductions in contractually based retirement benefits unless the affected retirees also agree to the reductions. Thus, the arbitration awards, which were based on the UFCW's "tentative agreement" to a reduction in retiree medical benefits below the contractually mandated levels, are not binding on the plaintiff class, which was not a party to the proceedings.

■ In the alternative to the defendants' contention they should be allowed to re-duce benefits across the board, the defendants argue that they should be allowed to reduce retiree benefits to the level set forth in the Master Agreement at the time a retiree retired. This sophisticated argument assumes that Armour was not bound to its retirees under the later Master Agreements; it assumes that the Union has no authority to bargain benefits upward. The Court concludes that the improved retiree benefits were bargained for modifications to the retiree's Agreement that are fully enforceable. The Court concludes that bargaining retiree benefits upward is a permissive subject of bargaining for a union. *Allied Chemical, supra,* 404 U.S. at 181 n. 20, 92 S.Ct. at 398 n. 20. The Court therefore rejects this contention of the defendants.

■ The Court concludes that Greyhound, as Plan Administrator, violated its fiduciary duty to plan participants by unilaterally changing benefit levels. At all relevant times, Greyhound was a plan fiduciary within the meaning of ERISA, 29 U.S.C. § 1002(21), which states:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

This Court has already found that several Greyhound officials exercised such functions when the decision to "redesign" benefits was made.

As a fiduciary, Greyhound was required to act in accordance with the following standard:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and .... for the exclusive purpose of ... providing benefits to participants and their beneficiaries; ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims....

ERISA, 29 U.S.C. § 1104(a)(1). Greyhound's decision to reduce medical benefits paid to retirees was based not on its concern for retirees, but solely on the defendants' self interest in reducing benefit costs. Therefore, Greyhound violated its plan fiduciary duty to the retirees. Greyhound would also violate its fiduciary duty by any future reduction in benefits.

■ A three-step analysis must be followed in determining whether a permanent injunction should issue:

1: Whether plaintiffs have actually succeeded on the merits of their claim;

2. Whether the "balance of equities" favors the granting of injunctive relief;

3. Determination as to the form of the injunction so that it is tailored to the specific harm shown.

*Coleman v. Block,* 580 F.Supp. 194, 209 (D.N.D.1984).

As to the first step, this Court has already outlined above that plaintiffs have, in fact, succeeded on the merits of their claim.

The second step, consideration of the balance of equities, requires a weighing of the following factors:

a. The threat of irreparable harm to the movant;

b. The balance between this harm and the harm that would result to the defendants from granting the injunction;

c. The public interest.

*Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 113 (8th Cir.1981); *Coleman, supra,* 580 F.Supp. at 209–10. No single one of these factors is controlling. *Dataphase,* 640 F.2d at 113.

This Court has found that since March of 1984 Greyhound and Armour have continually maintained that they had a right to "manage" retirement health insurance benefits, and thus have a continuing motive for their reduction or elimination in the future. Furthermore, as Judge Tashima held in *UAW Local 645 v. General Motors Corp.,* 112 LRRM 3344, 3345 (D.C.Cal.1982):

The lack of health care benefits will result in many cases in the inability to obtain needed medical treatment, and, in some cases, in the termination of current necessary treatment for employees or their dependents now covered by health insurance. The harm likely to result from termination of health benefits will be irremediable.

Those conclusions made by Judge Tashima on the facts before him are warranted here where retirees are involved because those persons are generally living on fixed incomes and usually need more health care because of their respective ages. Therefore, these circumstances require a finding of irreparable harm here.

The Court finds that the balance of harm would fall heavier on the side of the retirees if an injunction were not granted than it would on the Plan if an injunction is granted due to a decline in affordable health care services for retirees.

The Court finds that the public interest is served by granting the injunction. At stake is the health and well-being of retirees. Serious consequences may attend those who are unable to pay for health care due to decreased benefits in their health care plan. Others may simply become burdens on the state. For these reasons, the public interest is served by the following Order.

### ORDER

IT IS THEREFORE HEREBY ORDERED that the following relief shall be granted to plaintiffs:

1. The plaintiffs' prayer for declaratory relief is sustained. The Court declares that Defendants Greyhound and Armour are contractually obligated to provide the plaintiff class members at a minimum with the medical benefits of the Employee Welfare Benefit Plan for the duration of their lives, and to the plaintiff class members' eligible dependents as provided in said plan prior to the changes instituted by defendants on March 15, 1984.

2. The Court enters a permanent injunction requiring the defendants to reinstate the plan as it existed prior to March 15, 1984, and enjoining Defendants Greyhound and Armour from either reducing the amount of medical benefits paid under the plan as it existed prior to March 15, 1984,

or terminating the Employee Welfare Benefit Plan for retirees and their eligible dependents.

3. A hearing is hereby set for 2:15 p.m. on February 9, 1987 in the courtroom of the United States Courthouse, Sioux City, Iowa to determine the manner of computing damages. The Court will then entertain suggestions from all parties for enforcement of this Order, including but not limited to the appointment of a Special Master to supervise computation and payment of damages.

4. The Court enters judgment for plaintiffs and against defendants for plaintiffs' and intervenors' reasonable attorney fees and litigation expense, and all other relief that this Court deems necessary, pursuant to 29 U.S.C. § 1132(g). The amount of said reasonable attorney fees and litigation expenses shall be determined at the hearing referred to in the preceding paragraph.

5. The Court directs Defendants Greyhound and Armour to give notice pursuant to Fed.R.Civ.P. 23(d)(2) to those persons in the class who previously wrote the Clerk of Court regarding this case by mailing forthwith a copy of this Order. The Clerk shall send a list of the names and addresses of such persons to the defendants. Those persons may participate, if they wish, in the hearing to be held regarding damages.

6. The parties are directed to submit in writing to the Court a general outline of their proposal for computation and payment of damages of the class members not later than five days prior to the hearing date designated in paragraph 3 above.

### ORDER

### ON MOTION TO AMEND

The Court has before it the defendants' Motion to Amend or Make Additional Findings and to Alter or Amend Judgment, Docket Entry 92. Also pending is plaintiffs' Motion to Determine Attorney Fees, Expenses and to Tax Costs, Docket Entries 93 and 94; and the parties' proposals for computing and paying damages to class members, Docket Entries 96 and 98. The Court denies the Motion to Amend or Make Additional Findings and to Alter or Amend Judgment. The Court enters an Order regarding the computation of damages. The Court holds ruling in abeyance on the plaintiffs' Motion to Determine Attorney Fees, Expenses and to Tax Costs.

### I. Motion to Amend or Make Additional Findings and to Alter or Amend Judgment

In the Court's Order of January 14, 1987 (see page 1029), the Court construed the 1979 Master Agreement as awarding lifetime medical insurance benefits to retirees. The defendants first contend that the the Court should amend its findings to find that the parties to the Master Agreement intended that retiree medical benefits were *not* vested or lifetime benefits. The defendants rely on language found in past Master Agreements between the company and its union in support of their motion.

■ The defendants argue that the increase in contributions required of retirees under the 1964 Master Agreement is evidence that is inconsistent with findings that medical benefits are to continue undiminished for the lifetime of the retirees. The Court's Order, however, held that the 1979 Master Agreement awarded lifetime medical insurance benefits to retirees. The fact that the cost of the plan to retirees was raised in the 1964 Master Agreement is not particularly relevant to whether the later modifications to the contract gave the retirees lifetime vested benefits under the 1979 Master Agreement. The later collectively bargained modifications made to retirees' benefits are fully binding on the defendants. The defendants cannot now bargain down retiree benefits with a Union that does not represent the retirees, without the consent of retirees.

■ The defendants next contend that Armour's commitment beginning under the 1967 Master Agreement, and appearing in successive agreements, to pay for the full cost of hospital medical, and surgical coverage after retirement is inconsistent with findings in this Court's previous Order that retirees had vested lifetime benefits. The

Court rejects this argument because the lifetime benefits were collectively bargained modifications of existing contractual obligations that are fully enforceable, and cannot be rescinded without the consent of the affected retirees. *See* January 14, 1987 Order, p. 1033.

 The defendants next contend that language in the various past agreements between the Union and Armour that the Company "shall continue in effect" insurance benefits for past and future retirees, or that it "will extend" medical insurance benefits to past and future retirees is inconsistent with a finding of vested lifetime benefits. The defendants contend that such language reflects an intent of the parties to limit insurance coverage to the term of the currently effective agreement. Defendants rely on *Anderson v. Alpha Portland Industries, Inc.,* 647 F.Supp. 1109, 1127, (E.D.Mo.1986). However, *Anderson* is not persuasive on this point. In *Anderson,* a provision in a 1965 agreement between the Company and the Union provided that the Company would pay the future costs of all group insurance until the death of the retiree. This was the first and only time that the phrase appeared in the parties' 25 year history of negotiating retiree insurance benefits. 647 F.Supp. at 1128, 7 EBC at 2553. Regarding this provision the Court stated:

> While the Court concurs with defendant Alpha's position that the "until death" phrase probably signified a direct rejection of the union's submitted proposal to continue dependent benefits after a retiree's death, *at the same time it implies that those benefits would continue through the retiree's lifetime, and thus, as plaintiffs contend beyond the Agreement's terms....* In light of subsequent Agreements' provisions and the parties' later conduct, however, the Court finds this unique phrase is not significant for purposes of construing the more recent Agreements.

The instant case presents a stronger set of facts for finding that the contract contained vested lifetime benefits for hospital, medical, and surgical insurance coverage.

Section 18.7(f) of the 1979 Master Agreement provides in pertinent part:

> If a retiree dies
>
> \* \* · \* \* \* \*
>
> (ii) Who has selected a Qualified Joint and Survivor Annuity pursuant to Article VI Section 2 of the Armour Pension Program, the above provisions [regarding hospital, medical and surgical insurance coverage] shall continue for the surviving spouse and dependent children until the earlier of the surviving spouse's death or remarriage, or, in the case of a dependent child, until the earlier of the termination of the child's status as a dependent, or termination of the child's status as a dependent ..., or termination of coverage of the surviving spouse.

This provision has not been eliminated, nullified, or displaced, without timely objection by the retirees as was the somewhat similar provision in the *Anderson* case. The Court is persuaded that the instant case is more similar to *Bower v. Bunker Hill Co.,* 675 F.Supp. 1263 (E.D.Wash.1986) and *Policy v. Powell Pressed Steel Co.,* 770 F.2d 609 (6th Cir.1985) than to *Anderson.* In *Bower,* the summary plan description contained a provision similar to the Section 18.7(f) here. It provided that upon the death of a retiree the "children and surviving spouse may continue to be covered". 675 F.Supp. at 1265. This provision was a factor that the *Bower* Court relied on in upholding a Jury verdict for retirees. In *Policy,* the Court found that a contract clause providing that a spouse's benefits were "limited" to the life of the pensioner created an inference that the retiree's health insurance benefits continued for his life. *Policy, supra* at 615.

 The defendants next contend that the coordination of benefits clause which has existed in agreements between the Union and the Company since 1967 with modifications and which coordinated the retiree benefits with Medicare benefits reduced the insurance benefits payable by Armour to past retirees and is inconsistent with a finding that retiree insurance benefits were vested. The Court rejects this argument since it has found that the retiree benefits

as of 1979 are the benefits that are vested lifetime benefits. This history of the collective bargaining agreements while relevant to the issue of the parties' intent in the 1979 agreement, does not persuade the Court that there was an intent to exclude lifetime benefits.

■ The defendants next contend that the fact Armour and the United Food and Commercial Workers Union negotiated to reduce retiree benefits in 1983 reflects the parties' intent that retiree benefits were not vested for life. The Court rejects this argument because the Union did not represent the retirees, and therefore had no authority to negotiate retiree benefits downward. January 14, 1986 Order, p. 1037–38.

The defendants next contend that the Court should amend its findings regarding letters from Armour to retirees. Regarding the letters, the Court found that they clearly set out the parties' intent that the benefits were lifetime, and that Armour had previously construed them as such. Regarding the letters, the Court in pertinent part stated:

*Several* of these letters state in pertinent part: "The various benefits for you and your eligible dependents, if any, will be cancelled as of the end of the month in which your death occurs."

P. 1034. (emphasis supplied). In discussing the Plaintiffs' Exhibit 3 series, the Court was aware that *some* of the letters in Plaintiffs' Exhibits 3a—3o did not contain a statement such as the one quoted above (*e.g.* Plaintiffs' Exhibits 3m and 3n), but declines to change its findings.

■ Defendants also offered into evidence some other letters which do not include a statement such as the one quoted above. (*See* Defendants' Exhibit U series).[1] None of the letters that the defendants rely on in Exhibit U contain language limiting the duration of hospital, medical and surgical benefits. The fact that the Company did not inform all of its retirees by letter of the lifetime vested nature of their health insurance benefits is not incon-

sistent with this Court's findings that the 1979 Master Agreement provided lifetime vested benefits. The fact that Armour sent out letters such as Exhibits 3a—3l, 3o, and U23 reflects that the Company itself had in the past construed the contract as providing lifetime benefits. The only other possible inference from the letters would be that the Company misrepresented the duration of benefits provided. The Court cannot find that the Company made misrepresentations in its letters to retirees; the Company had no motive for doing so. The Court finds that the Company in the past has construed the benefits at issue here to be lifetime benefits.

■ Greyhound contends that it should not be found contractually liable. Armour is a wholly-owned subsidiary of Greyhound, and has been since 1971. This Court found that "[i]n March 1984, the defendants repudiated their obligations under the 1979 agreement in favor of 'managing' benefits to maintain costs below a predetermined level." (P. 1035). In the Court's January 14, 1987 Order it found that on December 17, 1983, Armour & Company had retained all liabilities for pension and retirement insurance benefits upon the sale of Armour Food Company to ConAgra. However, the contract of sale used the term "sellers" to describe the parties that were retaining these liabilities. (Exhibit 9, p. 43). A more careful reading of the definitional section reveals that the term "sellers" includes Greyhound as well as Armour. (Exhibit 9, p. 1). While it is true Greyhound is not named as a party to the 1979 Master Agreement, the Court finds that Greyhound, as owner of Armour is responsible for the retiree health insurance liabilities of Armour.

It is unnecessary to rely solely on the fact that Greyhound is "contractually liable" to hold Greyhound liable here. Greyhound is the plan administrator. The Court found that Greyhound as plan administrator owed a fiduciary duty to the class, *See* 29 U.S.C. Section 1102(c)(1), and that this fiduciary duty was violated. (P. 1035). Both Greyhound and Armour as co-fiduci-

---

1. Exhibit U23 does, however, contain a state-

ment such as the one quoted above.

aries have joint liability for violation of their fiduciary duties. 29 U.S.C. Section 1105(a)(2) and (3).

The defendants contend that the Court should amend its January 14, 1987 injunction to allow them to introduce "cost-containment" modifications. Examples of such "cost-containment" modifications include requiring second surgical opinions, prior review of elective non-emergency hospital confinement and alternatives to hospital confinement. The Court declines this invitation since it is without foundation in the present record. There is no evidence concerning how these "cost-containment" modifications would effect retirees' vested rights under the plan. No record has been made concerning whether these modifications would engender additional expense for the retirees, or effectively decrease benefits legitimately available to them. The request to amend to allow Greyhound to introduce "cost-containment" modifications is denied.

To summarize the Court's holdings on the issue of liability, this Court has reviewed this case by looking first at the collective bargaining agreement to determine whether the parties intended retiree benefits to continue beyond the expiration of the 1979 Master Agreement. This approach is counseled by the cases of *Loc. U. No. 150–A United Food v. Dubuque Packing*, 756 F.2d 66, 69 (8th Cir.1985), and *Intern. U., United Auto., Aero., Etc. v. Yard–Man*, 716 F.2d 1476, 1479–80 (6th Cir.1983). This Court found that the parties intended lifetime retiree benefits that would be vested upon retirement. For many of those persons retiring under contracts earlier than the 1979 Master Agreement went into effect, benefits were generally increased through bargained for modifications of past Agreements. The modifications are fully enforceable against the defendants. To the extent the 1979 Master Agreement could be considered ambiguous, the Court looked to parole evidence and found that the past conduct of the parties with respect to retiree benefits revealed that they intended lifetime vested benefits under the 1979 Master Agreement. The Court considered such things as exit interviews and letters from Armour to the retirees.

The Court has also considered the generally recognized principle that retiree benefits normally are vested and not subject to being bargained away by a union that does not represent retirees. *Policy, supra,* 770 F.2d at 609, *citing Yard–Man, supra* 716 F.2d at 1482, n. 8.

The Court further considered the recognized principle that retiree benefits are "status benefits" that carry with them the inference that they continue so long as the retiree maintains his status as a retiree. *Policy, supra,* 770 F.2d at 613–14; *Dubuque Packing,* 756 F.2d at 70; *Yard–Man, supra* 716 F.2d at 1482.

Having considered the foregoing the Court denies the Motion to Amend or Make Additional Findings and to Alter or Amend Judgment.

## II. Summary Plan Description

Plaintiffs contend that the defendants should draft a summary plan description within 30 days of this ruling that is consistent with this Court's construction of the retirees' vested rights under the plan. The defendants contend that it would take over 30 days to draft such a plan since there are five or six welfare benefit plans each of which would require a summary plan description. The defendants commented that if a summary plan description were generated during the pendency of appeal, duplicated efforts may be required if there is a reversal or remand by the appeals court. This Court believes that a deadline for submitting a summary plan description should be set despite the probability of an appeal. The deadline for completing the drafting of summary plan descriptions shall be ninety days from the filing date of this Order. Copies of the proposed draft shall be submitted to the Court and all counsel. If there is an appeal the Court would seriously consider a stay of the deadline for submitting a summary plan description upon application by the defendants.

### III. Proposals for Computing and Paying Damages to Class Members

The parties have each submitted proposals regarding the payment of damages to class members. Calculation of the damages would appear to be routine. There are, however, a large number of class members involved. There is no dispute that the damages of the class members are the differences between benefits actually paid under the plan that went into effect after March 15, 1984, and the benefit levels that should have been paid under the plans as they existed prior to March 15, 1984. Further, damages also include the cost of any replacement insurance purchased by class members due to the change in benefit levels. The Court shall require the parties to confer on the ground rules for processing claims, and shall consider the ground rules the parties agree upon at the time it reviews the proposed class notice.

Plaintiffs have requested the appointment of a master to supervise the calculation of damages. Under Rule 53(b), a master can be appointed in actions tried to the Court in "matters of account and of difficult computation of damages". In this case, the plaintiffs' Complaint is not directed at the defendants' computation of benefits, but the generally decreased level of benefits. The Court has no reason to believe that defendants will proceed improperly with the processing of claims. Indeed, the defendants have every incentive to proceed appropriately in this regard, because if they do not the Court will appoint a Master at the defendants' expense. The defendants state that they have computer programs available to their third party administrator, Travellers Insurance Company, designed to quickly calculate the amount of benefits under the pre-March 15, 1984 plan to which claimants are entitled. It may therefore be an unnecessary additional expense to require a master to supervise damage calculations. Any claimants having disputed claims shall file the same

with the Court. The Court will make a decision later as to whether a Master should be appointed, based on the number of contested claims.

■■■ The plaintiffs contend that pre-judgment interest at the rate of 10% per annum should be paid from the date that a class member's claim was either denied or paid in a reduced amount. The defendants resist an award of pre-judgment interest because pre-judgment interest is not specifically covered under the federal interest rate statute, 28 U.S.C. Section 1961. Pre-judgment interest should be awarded in an Employee Retirement Income Security Act (ERISA) case. *Short v. Cent. States, S.E. & S.W. Areas Pen. Fund,* 729 F.2d 567, 576 (8th Cir.1984). The plaintiffs suggest that the applicable rate is the 10% rate set forth in Iowa Code Section 535.3, and the defendants have not suggested another rate. The Court shall require interest to be paid at 10% from the date of the claim to date of the entry of judgment on the amount of the underpayment of the claim,[2] and post-judgment interest is awarded from the entry date of judgment calculated at the floating rate set out in 28 U.S.C. Section 1961(a).

### IV. Funding of the plan

■■■ The plaintiffs have requested that the Court enter an Order requiring the defendants to fund the medical insurance plan by setting aside $140 million in corporate funds. Plaintiffs state in pertinent part:

[T]he defendants have consistently sought to relieve Greyhound of any financial responsibility for the funding of the plan.... In short, unless Greyhound is required to guarantee the solvency of the plan, the clear potential exists for Greyhound to realize a sizeable profit from the sale of the Armour assets while leaving the retiree insurance plan without adequate funding.

---

**2.** The Court finds that it would be inappropriate to apply the floating rate derived under 28 U.S.C. Section 1961 for the award of pre-judgment interest because the Section 1961 interest rate is calculated based on the rate in effect on the

entry date of the judgment. This rate might not approximate the market rate in existence at the time of the claim. The Court has therefore looked to state law to supply an easily applied pre-judgment rate of interest.

The Court is persuaded that the plaintiffs have not shown a sufficient threat that the plan will become insolvent. The Court has considered the offer of proof presented by the plaintiffs at the hearing, but finds it unpersuasive. This Court has specifically provided in its Orders, and will so provide in the judgment that both Armour *and* Greyhound are liable for retiree insurance benefits. Thus, the fact that Greyhound has attempted to avoid liability in this lawsuit does not show a threat that the plan will become insolvent; nor does the fact that Greyhound has sold a large part of the Armour assets. Under 29 U.S.C. Section 1081(a)(1), employee welfare benefit plans such as the ones at issue here are specifically excepted from the general funding requirements for other ERISA retirement benefit plans such as pensions. The plaintiffs point to no provision in the 1979 Master Agreement requiring that the plans here be funded. For all of the above reasons, the request that the hospital, medical, and surgical insurance plans be funded is denied.

## V. Notice to class members

Within 30 days from the filing of this Order, the defendants shall be required to mail a notice approved by the Court to each class member, or his or her personal representative, with the following information:

(a) A brief description of the January 14, 1987 Order and the instant Order.

(b) A clear, concise description of the process for the computation and payment of damages.

(c) Plaintiff class members shall be informed of their right to file medical benefit claims not originally filed after March 14, 1984 and to file reimbursement claims for the cost of supplemental health care insurance purchased due to the reduction in medical benefits.

(d) Plaintiff class members shall be notified that due to the coordination of medical benefit payments with other health insurance carriers, if any, that any additional medical benefit payments received as a result of this decision may be subject to recovery by such other health insurance carrier for medical benefits paid by it.

(e) The class members shall be notified of the present status of this case regarding any appeal, and the fact that an attorney fee application is pending before the district court.

(f) Any other pertinent information.

## VI. Attorney Fees

The Court did not hear arguments or evidence on the attorney fee issue. It appears to be premature at this time. As a starting point in class action litigation, this Circuit requires the Court to give consideration to the following factors:

a) the number of hours spent in various legal activities by the individual attorneys,

b) the reasonable hourly rate for the individual attorneys.

c) the contingent nature of success, and

d) the quality of the attorneys' work.

*Grunin v. International House of Pancakes,* 513 F.2d 114, 127 (8th Cir.1975). In this case, the work of plaintiffs' attorneys is not finished, thus, under factor (a) above, the final number of hours spent on the case cannot yet be determined. The plaintiffs' attorneys must confer with the defendants on an appropriate notice to the class. The plaintiffs attorneys may need to monitor to some degree the computations of damages. The Court shall require from the parties an up-to-date report on their respective positions regarding the timing of any hearing on attorney fees after the class action notice is submitted to the Court for consideration.[3]

Accordingly,

IT IS THEREFORE ORDERED that:

---

**3.** The Court is not unmindful of the policy of this Circuit for district courts to promptly decide attorney's fees issues after judgment entry on the main claims so as to avoid fragmented appeals in cases calling for an award of attorney fees. *See Obin v. Dist. No. 9 of Intern. Ass'n, etc.,* 651 F.2d 574, 584 (8th Cir.1981), but does not believe this policy is necessarily applicable here.

1. The Motion to Amend or Make Additional Findings and to Alter or Amend Judgment is denied.

2. The damages shall be calculated as set out in Division III of this Order. The class members' damages shall be calculated as the difference between benefits actually paid under the plan that went into effect after March 15, 1984, and the benefit levels that should have been paid under the plans in effect before March 15, 1984. Damages further shall be paid on the cost of any replacement insurance purchased by class members due to the change in benefit levels. Interest shall be awarded on all damages at the rate of 10% from the date of each class member's claim to the date of entry of judgment, and thereafter at the rate under 28 U.S.C. Section 1961. The plaintiffs' request for appointment of a Special Master to supervise the calculation of damages is denied at this time.

3. The plaintiffs' request that the retiree medical insurance plan be funded is denied.

4. The parties shall confer and submit within 30 days a proposed class action notice to be mailed at defendants' expense following the parameters set out in Division V of this Order.

5. The plaintiffs' Motion to Determine Attorney Fees, Expenses and to Tax Costs is premature and is held in abeyance. The parties shall file a report within 30 days regarding their positions on the appropriate time for consideration of this motion.

6. The Court shall retain jurisdiction for purposes of approving the class action notice. The Court directs the Clerk to enter a judgment based on this Order, and the Court's January 14, 1987 Order. The time for filing a notice of appeal shall commence upon the Clerk's entry of the judgment. Rule 4(a)(1), Fed.R.App.P.

7. A copy of this Order shall be mailed forthwith by the defendants to those class members who have previously contacted this Court regarding this case.